IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SHERRY ROBINSON,                    )          CASE NO. 1:18-CV-290
                                    )
              Plaintiff,            )
                                    )
        v.                          )
                                    )          MAGISTRATE JUDGE
                                    )          KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL              )
SECURITY ADMINISTRATION,            )
                                    )          **MEMORANDUM OPINION & ORDER**
              Defendant.            )

Plaintiff Sherry Robinson ("Robinson") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

Magistrate Judge pursuant to the consent of the parties.  Doc. 12.

For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Robinson protectively filed her applications for DIB and SSI on December 1, 2014,

alleging a disability onset date of November 3, 2013.  Tr. 479, 481.  She alleged disability based

on the following: COPD, severe depression, hearing loss in her right ear, and arthritis.  Tr. 483.

After denials by the state agency initially (Tr. 326, 327), and upon reconsideration (Tr. 356,

357), Robinson requested an administrative hearing (Tr. 389).  A hearing was held before an

Administrative Law Judge ("ALJ") on August 11, 2016.  Tr. 113-141.  In his December 21,

2016, decision (Tr. 94-108), the ALJ determined that there are jobs that exist in significant

numbers in the national economy that Robinson can perform, i.e. she is not disabled.  Tr. 107.

Robinson requested review of the ALJ's decision by the Appeals Council (Tr. 446) and, on

December 15, 2017, the Appeals Council denied review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Robinson was born in 1965 and was 49 years old on the date she filed her applications.

Tr. 449.  She last worked in 2013 as a security guard.  Tr. 120.

### B. Relevant Medical Evidence[1]

On June 21, 2013, Robinson visited the emergency room complaining of groin pain that

worsened with prolonged standing or descending stairs, a burning sensation in her left arm, and

swelling in her left upper and lower extremities.  Tr. 644, 637.  She had a history of

hypothyroidism, asthma and COPD.  Tr. 644.  On exam, she had diffuse wheezing, no edema in

her extremities, diminished sensation in her left hand and forearm, 5/5 motor strength, and

tenderness in her left groin and axilla.  Tr. 645-646.  She was diagnosed with left arm and leg

pain, testing (ultrasound, lab work) was negative, and she was advised to follow up with her

primary care physician and a neurologist.  Tr. 646-647.

On June 26, 2013, Robinson saw a neurologist for groin pain and left arm burning.  Tr.

636.  Upon exam, she had normal strength, sensation, reflexes and gait.  Tr. 639.  The

impressions were meralgia parasthetica, maybe due to weight gain, or right brachial plexopathy.

Tr. 639.

In October 2013, Robinson went to the emergency room complaining of shortness of

breath with wheezing and chest tightness.  Tr. 694.  She reported having had a pulmonary

---

[1] Robinson only challenges the ALJ's findings regarding her physical impairments.  Accordingly, only the medical evidence relating to these impairments is summarized and discussed herein.

embolism many years ago with which she presented to the emergency room with shortness of breath.  Tr. 694.  She denied any prior hospitalizations for COPD, stated that she used her albuterol inhaler as needed, and indicated that she rarely had asthmatic attacks or COPD exacerbations.  Tr. 694, 710.  Upon exam, she was in respiratory distress, had prolonged expiration, wheezing and rhonchi, and used accessory muscles for breathing.  Tr. 697.  She had no extremity weakness or sensory loss, full range of motion, and no tenderness or edema in her extremities.  Tr. 696-697.  A chest x-ray showed perihilar congestion, atelectasis and decreased lung volume.  Tr. 688.  A CT scan of her chest confirmed mild bronchial wall thickening possibly related to reactive airway disease or bronchitis.  Tr. 687.  She was diagnosed with an acute exacerbation of COPD and was prescribed Methylprednisone and advised to continue albuterol treatments.  Tr. 709.

In February 2014, Robinson visited the Neighborhood Family Practice ("NFP") as a follow up for her hypothyroid disease.  Tr. 590.  Her thyroid had been removed in 2008.  Tr. 590.  She saw nurse practitioner Brandi Dobbs and reported fatigue, hair loss, hand numbness, swelling of her legs and occasionally her hands.  Tr. 590.  Her blood panel showed an elevated TSH level.  Tr. 590.  She had smoked cigarettes since she was eleven years old and also reported wheezing and a dry cough.  Tr. 590-591.  She complained of knee pain and edema in her legs and was using her mother's "water pill," although she was unsure what the dosage was.  Tr. 591.  She was using Advair for her COPD and exercised by walking 45 minutes every day.  Tr. 591.  Upon exam, she had wheezing when inhaling and rhonchi when exhaling.  Tr. 592.  Her thyroid medication was increased, she was prescribed naproxen for her knee pain, her diuretic was reordered, and she was advised not to take other people's medication.  Tr. 592-593.

On May 22, 2014, Robinson returned to NFP for an upper respiratory infection and saw nurse practitioner Renata Kadlcek. Tr. 583. She reported increased sleep and feeling sick. Tr. 583. She stated that she did not miss doses of her thyroid medication but does miss doses of other medication and that in a few days she would be out of her medications. Tr. 584. She was using her albuterol twice daily when she had previously used it once or twice a week. Tr. 584. Upon exam, she was obese, ill- and sickly-appearing, distressed, and she had wheezes and decreased breath sounds, although she was not in respiratory distress. Tr. 587. She had normal strength and range of motion in her extremities, normal sensation, and edema. Tr. 587. All her medications were restarted, she was prescribed Prednisone and an antibiotic, and advised to return in two weeks. Tr. 587, 589.

On June 4, 2014, Robinson returned and saw Nurse Kedlcek. Tr. 580. She was still coughing "but feels 100% better." Tr. 580. She hadn't had to use her albuterol. Tr. 580. Upon exam, she did not appear ill or distressed, she had decreased breath sounds, no rhonchi, wheezes or rales, and she had normal strength, muscle tone, range of motion and coordination. Tr. 581. Her antidepressant medication (Wellbutrin) was causing increased symptoms; her dosage was decreased and Kedlcek recommended switching medication if the decreased dose did not improve her symptoms and that she stop smoking. Tr. 581, 582.

On July 17, 2014, Robinson visited NFP complaining of left knee pain after falling two days prior. Tr. 576. She saw nurse practitioner Joannah Lynch. Tr. 576. She also requested an increase in her thyroid medication and switching from Wellbutrin to another medication. Tr. 576. She reported that she could walk but her knee hurt when bending and straightening it all the way. Tr. 577. It popped when she walked and an area on the outside of her kneecap was tender. Tr. 577. Upon exam, her left knee was swollen and tender on the outer aspect of her patella, but

she had no bony tenderness, a full range of motion, and her knee was stable. Tr. 578. Her respiratory exam was normal. Tr. 578. She was switched to a different anti-depressant (Celexa) and x-rays were ordered. Tr. 579.

On August 18, 2014, Robinson saw Nurse Lynch again for a follow up and medication refill. Tr. 572. She had not started her new thyroid dose yet because she needed to change her pharmacy; she had been taking the old dosage. Tr. 573. As a result, she had been feeling very fatigued. Tr. 573. Her asthma was under good control; she used her rescue inhaler once a day and her Advair once a day. Tr. 573. Her Celexa was helping. Tr. 573. She had been walking two miles a day and had lost 10 pounds since May. Tr. 573. Upon exam, she had scant expiratory wheezing on her right side and no edema in her extremities. Tr. 574. She declined respiratory treatment in the office and Lynch advised her to use her albuterol when she got home. Tr. 575. At the time, she had cut down to smoking half a pack of cigarettes a day. Tr. 573.

On September 11, 2014, Robinson saw Nurse Lynch for coughing and chest congestion. Tr. 563. Her inhalers had been helping but her symptoms kept returning. Tr. 563. Upon exam, she had wheezes; she was diagnosed with an upper respiratory infection and prescribed Prednisone. Tr. 565.

On September 17, 2014, Robinson saw Tarriq Jamil Khan, M.D., in endocrinology for her hypothyroidism. Tr. 627. Robinson admitted missing her thyroid medication "here and there but not more than 1 to 2 times per month." Tr. 628. Dr. Khan observed that when he called the pharmacy about her medication "I was surprised to find that [she] has not filled her medication between 7/14 and 8/14." Tr. 628. Her physical examination was normal. Tr. 628. Dr. Khan remarked that half of the 40-minute visit was spent instructing Robinson about "strict compliance with thyroid hormone therapy" to optimize her treatment and prevent risks

associated with high or low thyroid levels. Tr. 630. He opined that her fluctuating high/low thyroid levels were caused by her irregular intake of different doses of her thyroid medication. Tr. 630. He readjusted her thyroid medication dosage. Tr. 630.

On January 8, 2015, Robinson saw Nurse Lynch complaining of chest congestion for the last four days. Tr. 735. She also reported burning in her feet and legs. Tr. 735. Upon exam, she had clear nasal discharge, wheezes, no rhonchi or respiratory distress, no edema in her extremities and intact range of motion, and very slight decreased sensation in her bilateral lower extremities. Tr. 734. She was diagnosed with bronchitis and prescribed an antibiotic and prednisone, and diagnosed with neuropathic leg pain and prescribed gabapentin. Tr. 735.

On February 9, 2015, Robinson had a pulmonary function study that showed a mild restriction. Tr. 671. X-rays of her right knee showed moderate tri-compartment and proximal tibofibular joint degenerative arthropathy and x-rays of her left knee showed moderate joint space narrowing and moderate spurring. Tr. 676.

On July 22, 2015, Robinson returned to Nurse Lynch complaining of chest congestion and bilateral leg pain. Tr. 727. She reported that her legs were giving out and she had increased pain. Tr. 727. Upon exam, she was in no respiratory distress but had wheezes and rales and she had no edema in her extremities. Tr. 729. Lynch increased her gabapentin and prescribed an antibiotic and prednisone. Tr. 729-730. She referred her to a neurologist. Tr. 730.

On September 15, 2015, Robinson saw neurologist Hari Prasad Kunhi Veedu, M.D. Tr. 757. She reported a burning sensation in her legs, falling while walking, and tingling and numbness in her fingers. Tr. 758. Upon exam, she had intact sensation, full strength, normal coordination, absent reflexes, and a normal gait. Tr. 760–761. Dr. Veedu ordered EMG testing, diagnosed peripheral neuropathy of unknown etiology and continued her gabapentin. Tr. 761.

EMG testing in October 2015 revealed no evidence of peripheral neuropathy. Tr. 771, 777.

On November 27, 2015, Robinson followed up with neurology and saw Lingling Rong, M.D. Tr. 774. She reported numbness and a burning sensation in her feet since 2010 that had gradually moved to her right thigh and hands. Tr. 775. Upon exam, her extremities had no edema. Tr. 776. She reported decreased sensation in her forearms and lower legs, had full strength, normal coordination, normal reflexes, and a normal straight gait with slight difficulty in the tandem walk. Tr. 777. Dr. Rong diagnosed peripheral neuropathy secondary to poorly controlled hypothyroidism and instructed Robinson to follow up with endocrinology "asap," to keep exercising, and to maintain a healthy weight. Tr. 777.

On December 1, 2015, Robinson had an endocrinology follow up appointment. Tr. 782. The provider noted that Dr. Khan had previously discussed the necessity of consistent medication compliance and Robinson reported that she had taken her thyroid medication daily since September except for one missed week in October. Tr. 785. "She genuinely states that she now desires to feel better." Tr. 785. She stated that she "will begin in earnest to take daily thyroid hormone" as prescribed. Tr. 785. Her medication dosage was increased. Tr. 785, 790. Upon exam, her lungs were clear. Tr. 785.

On March 2, 2016, Robinson returned to endocrinology for a follow up visit. Tr. 790. She reported feeling "much better" and desired to "continue to feel good." Tr. 793. Upon exam, she had scattered wheezes in her lungs. Tr. 793. Her medications were continued. Tr. 793.

Then next day, Robinson went to NFP and saw nurse practitioner Lauren Lasko. Tr. 722. She complained of difficulty breathing only at night and leg pain. Tr. 722. Upon exam, she had

wheezes in her lungs, a normal range of motion in her musculoskeletal system without any tenderness, and mild swelling in her lower legs. Tr. 723. Lasko increased her gabapentin. Tr. 723. She diagnosed her with a COPD exacerbation and prescribed prednisone. Tr. 723. At that time, her other diagnoses included: neuropathic pain of the bilateral lower extremities, chronic airway obstruction, arthritis of the knee, edema, and obstructive bronchitis with exacerbation. Tr. 724.

### C. Medical Opinion Evidence

#### 1. Treating Source

On July 11, 2016, Nurse Lynch completed a "Treating Source Statement–Physical Conditions." Tr. 749–752. She stated that Robinson had been a patient at NFP for five years, during which time she has been seen approximately 15 times by various providers. Tr. 749. She listed Robinson's diagnosis: COPD, hypothyroidism, hyperlipidemia, dysthymic disorder, neuropathic leg pain, and tobacco use. Tr. 749. She opined that Robinson could rarely lift and carry ten or less pounds; that she could sit for seven hours in an eight-hour workday, stand for four, and walk for one; and she needed a sit/stand option, all due to shortness of breath upon exertion and back/leg pain. Tr. 750. She did not need a cane. Tr. 750. She could occasionally reach overhead, push, and pull, and frequently handle, finger, and feel, due to shortness of breath upon exertion. Tr. 751. She would be absent from work two days per month. Tr. 749. She could rarely climb ramps and stairs, and never ladders or scaffolds; could rarely stoop and never kneel, crouch or crawl; and could occasionally rotate her head and neck, all due to shortness of breath upon exertion. Tr. 752. She could occasionally be exposed to unprotected heights, moving mechanical parts, operating a motor vehicle, and vibrations, and never be exposed to

humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold and extreme heat.  Tr. 752.  On July 12, 2016, Charles Garven, M.D., a doctor at NFP, co-signed the form.  Tr. 752.

### 2. State Agency Reviewing Physician

On March 2, 2015, state-agency reviewing physician Abraham Mikalov, M.D., opined that Robinson could perform light work (lift/carry 10 pounds frequently and 20 pounds occasionally; stand/walk for 6 hours in an 8-hour day and sit for 6 hours in an 8-hour day) due to COPD and left knee pain.  Tr. 299.  She could occasionally climb ramps and stairs but never ladders, ropes or scaffolds, could frequently stoop and occasionally kneel, crouch and crawl.  Tr. 299-300.  She had to avoid concentrated exposure to extreme heat and cold and humidity; concentrated exposure to pulmonary irritants; and all exposure to "Hazards (machinery, heights, etc.)."  Tr. 300.  In the narrative portion of his opinion, Dr. Mikalov explained that Robinson had to avoid exposure to unprotected heights, moving machinery and commercial driving due to fatigue associated with thyroid disease.  Tr. 301.  On June 2, 2015, state agency reviewing physician Edmond Gardner, M.D., adopted Dr. Mikalov's opinion.  Tr. 335–337.

### D. Testimonial Evidence

### 1. Robinson's Testimony

Robinson was represented by counsel and testified at the administrative hearing.  Tr. 117.  She last worked as a security guard at a casino in 2013; she had worked there for about 2.5 months and then she got ill, could not breathe, and had to go to the hospital.  Tr. 120.  Because the employer operated under a point system, due to her illness she did not meet the requirements of the point system and could no longer work.  Tr. 120.  When performing that job she walked around, stood at posts for about 4 hours, and other times she would be at the door or roaming.  Tr. 121.  Prior to that job, she worked other security jobs.  Tr. 117-119.  She had received no

complaints about how she performed her job. Tr. 125. She left her prior job as a security guard to take the job at the casino because the benefits were better. Tr. 125. At her prior job, she would rarely lift or carry about 20 pounds. Tr. 127.

Robinson has had problems with her breathing and was diagnosed with COPD in 2001. Tr. 121. At the hearing, she was wheezy. Tr. 121. Her COPD gets worse with activity and she can't walk for a long period of time. Tr. 121. She estimated she can walk for maybe 10-12 minutes and then, having neuropathy in her legs, they feel like there's needles and she has constant pain. Tr. 122. When asked if any activity she undertakes causes breathing problems, Robinson answered that it depends how much she would have to do it. Tr. 122. With the medications she takes for her COPD, it's really hard when she has to use her nebulizer because she takes it four times a day and it takes seven minutes. Tr. 122. She has been using her nebulizer four times a day since 2008. Tr. 130. She used it at work, although she tried not to use it there because they frowned on it. Tr. 130. If the nebulizer treatment doesn't clear her up she has to do it again. Tr. 122. She also has an albuterol inhaler. Tr. 122. Despite the fact that she takes her medication, she has flare-ups and has to see the doctor and they give her a steroid. Tr. 129. This happens about every two months, more during the winter. Tr. 129-130. At one point she smoked three packs of cigarettes a day, but at the time of the hearing she had quit and had not smoked for 21 days. Tr. 130.

Robinson also has pain in her knees, left more than right, and pain in both legs from neuropathy. Tr. 123. It feels like stepping on needles. Tr. 123. She estimated she could stand for no more than a half hour, taking into account her breathing problems and neuropathy and knee problem. Tr. 123. Sitting bothers her hips and legs and then when she tries to stand up it hurts to get started. Tr. 123. She thought she could sit for maybe 30 minutes. Tr. 124. There is

no comfortable position and she lies down most of the day, although her hips and lower back have started bothering her.  Tr. 124.  She was given Flexeril and it makes her sleepy and so she usually falls asleep.  Tr. 124.

When asked if she performs household chores, Robinson stated that it is hard for her to climb steps and that her family helps her out.  Tr. 127.  Her sister drove her to the hearing and helps her around the house.  Tr. 127.  She sometimes goes shopping but most of the time her sister or son will do it for her because she can't walk for long periods of time.  Tr. 128.  She does not leave her house much.  Tr. 128-129.  She could not perform her prior work because her breathing and legs have gotten worse.  Tr. 131.

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 133-140.  The ALJ asked the VE to determine whether a hypothetical individual of Robinson's age, education and work experience could perform Robinson's past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform Robinson's past work as a security guard and other jobs in the national economy.  Tr. 137.

## III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his December 21, 2016, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018. Tr. 96.

2. The claimant has not engaged in substantial gainful activity since November 3, 2013, the alleged onset date. Tr. 96.

3. The claimant has the following severe impairments: mixed hearing loss in left ear; thyroid disorder; arthritis of the left knee; obesity; asthma; chronic bronchitis; chronic obstructive pulmonary disease; mixed hyperlipidemia; and dysthymic disorder. Tr. 96.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 97.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(6) except occasionally climbing ramps and stairs, and no climbing ladders, ropes or scaffolds; frequently stoop and occasionally kneel, crouch, or crawl. She must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases and poor ventilation. The claimant must avoid all exposure to unprotected heights, moving machinery and commercial driving. She can perform routine familiar tasks without expectation for sustained fast pace, close concentration, high productivity quotas or strict deadlines. She should have a work setting with clear and predictable expectations and infrequent changes in routines. Tr. 100.

6. The claimant is capable of performing past relevant work as a security guard. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. Tr. 105.

7. The claimant has not been under a disability, as defined in the Social Security Act, from November 3, 2013, through the date of this decision. Tr. 107.

## V. Plaintiff's Arguments

Robinson challenges the ALJ's decision on two grounds: the ALJ erred when he considered the opinion evidence and his RFC assessment is not supported by substantial evidence. Doc. 15.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. The ALJ did not err with respect to the opinion evidence

#### 1. Nurse Lynch's opinion

Robinson argues that the ALJ erred when he failed to give controlling weight to the opinion signed by Nurse Lynch and co-signed by Dr. Garven. Doc. 15, p. 11. Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).[3] A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment

---

[3] The Code of Federal Regulations governing the Social Security Administration have been revised, including with respect to treating sources, but the relevant prior versions govern this case because the ALJ's decision pre-dated the effective date of the revised regulations.

or evaluation and who has had an ongoing treatment relationship with the claimant. *See* 20 C.F.R. § 404.1502. The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition. *Id.* "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]" *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).

The plaintiff has the burden of showing that a doctor is a treating physician. *See id.* at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters*, 127 F.3d at 529 (claimant has the burden of proof in steps one through four). Before determining whether the ALJ complied with the treating physician rule, the court first determines whether the source is a treating source. *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). A physician qualifies as a treating source if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith*, 482 F.3d at 876.

The ALJ considered Lynch's opinion:

The record contains a treating source statement, which was completed by nurse practitioner Joannah Lynch, FNP, and signed off by Charles James Garven, M.D., of Neighborhood Family Practice, in July 2016 (See generally 9F). The statement noted the claimant has been seen at Neighborhood Family Practice since December 2011 for approximately fifteen visits with various providers (9F/5).

                    *          *          *

Although Ms. Lynch does not qualify as an "acceptable medical source" as defined by 20 CFR 404.1502 and 416.902, she does qualify as an "other source' as defined by 20 CFR

404.1513(d) and 416.913(d). As an "other source," Ms. Lynch cannot establish the existence of medically determinable impairments. However, according to SSR 06-3p, the undersigned may use statements from "other sources" as evidence to show the severity of the individual's impairment and how it affects the individual's ability to function. The undersigned has considered the opinion of Ms. Lynch pursuant to SSR 06-3p, but assigns it little weight, as it is not consistent with the record as a whole. Specifically, the assessed exertional limitations are not consistent with the evidence of intact range of motion and stability of the knee as well as a normal straight gait on examination (1F/29, 32, 38; 8F/6, 10F/8, 24). Moreover, the assessed manipulative limitations are not supported by the record (See generally 1F-10F). Finally, the conclusion that the claimant would miss days of work due to her impairments was made without explanation and is not supported by the record.

Tr. 104-105.

As an initial matter, the ALJ accurately found that Dr. Garven and Nurse Lynch are not treating sources and, therefore, their opinions are not subject to the treating physician rule. Dr. Garvin is not a treating source because there is no evidence in the record that he treated Robinson. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 506-508 (6th Cir. 2006) (plaintiff failed to show doctor was a treating physician and, therefore, doctors' opinion was not entitled to presumptive weight per the treating physician rule); *Walters*, 127 F.3d at 529 (claimant has the burden of proof in steps one through four). Lynch is a nurse practitioner and not a treating source. *See* 20 C.F.R. 404.1513(d) (other, nonacceptable medical sources include nurse practitioners, physician's assistants, and therapists); SSR 06-3p, 2006 WL 2329939, at *2 (listing types of acceptable medical sources and "other" sources and stating that only acceptable medical sources can be considered treating sources); *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011).

Robinson argues that the ALJ erred when he determined the opinion was completed by Nurse Lynch and co-signed by Dr. Garven. Doc. 15, p. 11. She argues that Robinson received "primary care treatment at [NFP], a family practice facility that uses a team approach to treatment." Doc. 15, p. 12. As proof that NFP uses a team approach, she relies upon Lynch's

statement in the opinion form that Robinson treated with "various providers" 15 times over the prior five years. Doc. 15, p. 12. The fact that Lynch noted that Robinson saw various providers over the last five years does not document a "team approach"; it merely indicates that Robinson saw different providers when she went to NFP. Notably, there is no record evidence that she ever saw Dr. Garven. The cases Robinson relies upon in support of her position do not support her position. See Doc. 15, p. 12 (citing *Borden v. Comm'r of Soc. Sec.*, 2014 WL 7335176, at *9-10, n. 2 (N.D.Ohio Dec. 19, 2014) (rejecting the claimant's argument that an opinion signed by an "other source" is entitled to deference and recognizing that courts in other districts have found an opinion co-signed by an acceptable medical source may represent a "team" opinion due treating physician deference, but only where there is evidence that the acceptable medical source worked closely with the team or was consulted, not when the acceptable source merely cosigned the opinion); *McCoy v. Comm'r of Soc. Sec.*, 2017 WL 3594568, at *10-11 (N.D.Oh. Aug. 18, 2017) (remanding because the ALJ failed in her duty to develop the record: eighteen months worth of mental health treatment notes were not obtained and one opinion signed by an "other" source also contained an unrecognized signature that may or may not have been the claimant's treating psychiatrist; with further record evidence, the ALJ may have treated this opinion differently); *Pater v. Comm'r of Soc. Sec.*, 2016 WL 3477220, at *6-7 (N.D.Oh. June 27, 2016) (remanded because the ALJ did not discuss whether the opinion, co-signed by the claimant's psychiatrist "who actually saw and evaluated Pater," was considered by the ALJ to be a treating source opinion)). Here, there is no evidence that Dr. Garven did anything other than co-sign the opinion the day after Lynch filled it out; the opinion is not entitled to deference under the treating physician rule based on the "team approach" theory.

Robinson asserts that the ALJ failed to assess Lynch's opinion. Doc. 15, p. 12. This is incorrect; the ALJ assessed Lynch's opinion and gave it "little weight." Tr. 105. Robinson states that the ALJ's decision runs "counter" to SSR 06-3p, 2006 WL 2329939, which advises that "other sources," like nurses, are important and should be evaluated. Doc. 15, p. 13. The ALJ cited SSR 06-03p; the fact that he gave the opinion less weight than Robinson likes does not mean the ALJ failed to consider it or follow SSR 06-3p.

Robinson argues that the reasons cited by the ALJ were not good enough. She argues that the "only reasons cited by the ALJ ... is that it is 'not consistent with the record as a whole.'" Doc. 15, p. 13. She does not provide legal authority that this reason, alone, is insufficient. Moreover, the ALJ elaborated: he described that Robinson regularly had intact range of motion, a stable knee, and a normal, straight gait; no manipulative problems; and the assessed number of days a week Robinson would miss work was not explained or supported. Tr. 105. Robinson complains that the medical records cited by the ALJ "have little bearing on the evidence of the record as a whole or on the reasons identified" in Lynch's opinion. Doc. 15, p. 13. The ALJ observed that the cited records show regularly intact range of motion, a stable knee, full strength, and a normal gait, Tr. 578, 581, 587, 723, 761, 777. These findings are highly relevant; they do not have merely "little bearing" on Robinson's ability to stand and walk. As for the reasons identified by Lynch in her opinion, Lynch stated that Robinson's abilities to stand and walk were limited due to shortness of breath upon exertion and back and leg pain. Tr. 750. The fact that Robinson routinely had a normal gait and full strength and range of motion in her legs indicate that her ability to stand and walk was not as limited by leg and back pain as Lynch opined. *See*, *e.g.*, 20 C.F.R. 404.1529(c)(2) (objective medical evidence, such as range of motion, muscle spasm, sensory deficit or motor disruption is a useful indicator of the severity of symptoms). As

for her shortness of breath, the ALJ remarked elsewhere in her opinion that Robinson had a longstanding history of asthma and COPD (over 15 years); she had been a heavy smoker for decades and was a current smoker; although she sought emergency room treatment for a COPD exacerbation in 2013, prior to her alleged onset date, she had not required emergency room treatment for her breathing during the relevant time period; she was treated for her breathing at her primary care clinic, NFP, where she was found at times to have wheezing and decreased breath sounds but was not in respiratory distress; a pulmonary function study in early 2015 showed a mild restriction; and in August 2014 she had reported to Lynch that she walked two miles a day.  Tr. 101, 102.  The ALJ also concluded that Robinson's impairments were not as severe as alleged because she had had conservative treatment and she had been noncompliant with treatment, Tr. 104, a finding Robinson does not challenge.

Robinson complains that some of the records (2 out of 6) the ALJ cites as showing full strength and range of motion in her legs were visits for respiratory problems, not leg problems.  Doc. 15, p. 14.  She does not cite legal authority that objective examination findings can only be considered by an ALJ when they are the stated reasons for the visit.  Moreover, the two records in which Robinson complained only of respiratory problems were visits to NFP, her primary care clinic where she received treatment for both her leg and breathing problems.

Robinson asserts that the ALJ did not address Robinson's exam findings of lower leg edema.  Doc. 15, p. 14.  The fact that Robinson at times presented with edema in her lower extremities does not mean she was unable to stand or walk.  Moreover, the record shows that she had been prescribed a diuretic for lower extremity edema; she admitted she inconsistently took her medications; and at one point she had been taking her mother's "water pill" although she was unsure of the dosage and she was advised not to take other people's medications.  Tr. 591-593.

Finally, Robinson complains that the ALJ's reasons for discounting Lynch's opinion did not take into account Robinson's leg pain due to peripheral neuropathy (Doc. 15, pp. 14-15). But a diagnosis, alone, does not establish a functional limitation caused by that condition. *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990). Furthermore, her neurologist diagnosed peripheral neuropathy secondary to her poorly controlled hypothyroidism, for which she was non-compliant with medication, as the ALJ observed. Tr. 102, 777. The ALJ considered Robinson's leg pain and found that the record supported a finding that she could perform light work due, in part, to the fact that she routinely had a normal gait and full range of motion and muscle strength in her legs upon examination. This is substantial evidence that supports the ALJ's decision. *See Wright*, 321 F.3d at 614 (a court must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record).

### 2. Other opinion evidence

Robinson argues that the ALJ erred in giving "great weight" to the state agency reviewing physicians, Drs. Mikalov and Gardner. Doc. 15, p. 15. She asserts that these physicians limited Robinson to avoiding "all" exposure to "hazards" but that the ALJ only limited Robinson to avoiding all exposure to unprotected heights, moving machinery and commercial driving. Doc. 15, p. 15. First, an ALJ is not required to adopt an opinion verbatim. *See Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) (The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician, and the ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."); *Reeves v. Comm'r of Soc. Sec.* 618, Fed. App'x 267, 275 (6th Cir.

2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."). Next, in the narrative portion of their opinions, Drs. Mikalov and Gardner explained that Robinson must avoid all exposure to unprotected heights, moving machinery and commercial driving, which is what the ALJ limited Robinson to. Tr. 100, 301, 337.

Robinson argues that the VE testified that "hazards" include situations that law enforcement, including security guards, are exposed to. Doc. 15, p. 15; Tr. 136. However, even if Robinson would be precluded from performing her past work as a security guard based on the VE's testimony, the VE cited other jobs that Robinson could perform: marker, cafeteria attendant, and router. Tr. 138. The ALJ included these jobs in his decision as an alternative to Robinson's past relevant work that she could perform. Tr. 106-107.

Robinson also argues that, based on VE testimony, the ALJ should have found that she did not have transferable skills, and, therefore, per Medical Vocational Guideline 201.14 she would be disabled upon reaching age 50. Doc. 15, pp. 15-16. This is incorrect; Guideline 201.14 does not apply to Robinson because it addresses sedentary work and Robinson was found to be capable of performing light work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14.

**B. The ALJ's RFC assessment is supported by substantial evidence**

Robinson argues that the ALJ's assessment that she can stand and walk six hours a day is unsupported by substantial evidence. Doc. 15, p. 16. She asserts that she had intensive treatment for her respiratory symptoms, "including four times a day nebulizer treatments, daily inhalers, and daily respiratory medications," but that, despite these treatments, her respiratory issues were uncontrolled. Doc. 15, p. 16. She states that she was prescribed prednisone on a

regular basis and had a respiratory-related hospitalization prior to her alleged onset date.  Doc. 15, p. 16.

The ALJ found that Robinson's respiratory impairments—COPD, asthma, and chronic bronchitis—were severe.  Tr. 96.  He considered her treatment and objective findings.  Tr. 102. Robinson asserts that the ALJ "failed to perform the required analysis of this evidence."  Doc. 15, p. 16.  But the ALJ accurately noted that Robinson had a respiratory-related emergency room visit in October 2013 and that she had had none during the relevant period.  Tr. 102.  She had a long history of heavy smoking, she treated with her general practitioner, a pulmonary function study showed a mild restriction, and she regularly was observed upon exam not to be in respiratory distress and to have mild respiratory findings.  Tr. 102.  Robinson contends that she was prescribed prednisone on a regular basis (Doc. 15, p. 16 (citing treatment notes)), but at those visits Robinson was not in respiratory distress and had mild respiratory findings.  See Tr. 587 (5/22/2014 COPD exacerbation: wheezes, decreased breath sounds, no respiratory distress, no rales); 565 (9/11/2014 diagnosed with an upper respiratory infection: wheezes, no respiratory distress); 729 (7/22/2015 COPD exacerbation, had been using inhalers only: wheezes, rales, no respiratory distress); 724 (3/3/2016 difficulty breathing only at night: diffuse wheezes, no respiratory distress).[4]  In other words, the treatment notes cited by Robinson do not show that the ALJ's RFC assessment is unsupported by substantial evidence.  And, as for Robinson's leg pain, as explained above, the ALJ considered her complaints of pain but noted that she regularly had normal exam findings.  In short, the ALJ's RFC determination is supported by substantial

---

[4] Robinson also cites Tr. 709, but that is a treatment note from her October 2013 emergency room visit prior to the relevant period, and Tr. 229, a record that was not submitted to the ALJ and not considered by the Appeals Council (Tr. 2) and which cannot be considered here.  *See Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464, 472-473 (6th Cir. 2014) ("We have repeatedly refused to consider evidence submitted after the ALJ issued his decision when reviewing that decision for substantial evidence under 42 U.S.C. § 405(g)" citing *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) and *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)).

evidence and must, therefore, be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477

(6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports

the ALJ's conclusion, even when substantial evidence may support the claimant's position).

### VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**


IT IS SO ORDERED.



Dated: January 28, 2019                          */s/ Kathleen B. Burke*
                                                 _____
                                                 Kathleen B. Burke
                                                 United States Magistrate Judge